## FRANCIS LONG vs. The State.

1. CONTINUANCE: *Dangerous exercise of judicial discretion.*
   It is a dangerous exercise of judicial discretion to refuse a continuance and a postponement of trial to a future day of the term, where the affidavit alleges material facts, where all diligence has been shown by the applicant, and where it is averred that the same proof can be made by no other than the absent witness. A reversal will not be granted if it is shown by the record that every material fact set out in the affidavit for the continuance was subsequently proved by other witnesses.

2. PRESENCE OF THE ACCUSED IN CRIMINAL TRIALS: *Recitals of the record.*
It is well settled that the record must affirmatively show the presence of the accused, when in custody, during the entire trial before the jury. Whether the same requirement exists as to the leaving of questions of law is not definitely settled, but the safer rule is that in all cases of felony the records should show the presence of the accused in every step in the progress of the cause so important as a motion to quash the indictment.

3. MURDER: *Testimony as to antecedent malice, and in rebuttal.*
On a trial for murder, the state having introduced testimony tending to show antecedent malice and previous preparation for the combat, the accused has the right to introduce testimony tending to show that such preparation was made in anticipation of an expected attack upon himself, and the exclusion of such testimony is error.

4. SAME: *"Apparent danger" a mixed question of law and fact. Right of the court to instruct thereon.*
Apparent danger is a legal term, with a fixed and definite meaning. What circumstances constitute apparent danger is primarily a mixed question of law and fact, but when all the facts are ascertained it is a question of law alone. The court has the right to give a charge, which sums up all the facts relied on by the state, hypothetically, and inform the jury that if they believe that such were the facts, and all the facts attending the killing, the same do not constitute what the law means by apparent danger. Such charges are calculated to mislead and should be rarely given.

5. SAME: SAME: *Duty of jury in passing upon action of accused.*
In passing upon the action of a party who has slain another the jury should not try him by the light of after developed events, nor hold him to the same cool and correct judgment which they are able to form. They should put themselves in his place, and judge of his act by the facts and circumstances by which he was surrounded. They should not give him the benefit of personal timidity or needless fears.

6. SAME: *Previous preparation of weapon.*
A charge to the effect that he who enters into a combat dangerously armed, and with undue advantage, and slays his adversary, is guilty of murder, is erroneous, because omitting the qualification that the weapon had been procured for the combat, or that the accused provoked the difficulty, or entered into it with any intention of using the weapon.

7. SAME: *Right of self-defense.*
That the right of self-defense is derived from nature, and not granted by the law, is a truism which in no manner affected the issue, and a refusal to grant a charge announcing it is not ground for reversal.

8. SAME: *Self-defense. Anticipating attack of adversary.*
One need not always await the attack of his adversary, but may, in extreme cases, anticipate the attack, and take the life of his antagonist, if necessary to save his own, but this principle is not applicable to the case at bar, and a charge announcing it was properly refused.

9. SAME: SAME: *Flight as a mode of avoiding danger.*
The real or apparent danger which will justify the taking of the adversary's life

must be imminent, impending, and present, but it need not be unavoidable except by slaying the adversary. A man need not avoid danger by flight, but so long as he is in a place where he has a right to be, and is neither engaged in an unlawful enterprise, nor the provoker, nor the aggressor in the combat, he may stand his ground and resist force by a force proportioned to the attack.

10. SAME: *Manslaughter. Revised Code, 1871, § 2638. Code, 1857, p. 602.*

Those sections of the code of 1857 and of 1871 which announce that "the unnecessary killing of another, while resisting an attempt to commit a felony, or do some other unlawful act, or after such attempt has failed and been abandoned, shall be manslaughter and not murder," mean that the unlawful act spoken of must be of a criminal nature, though only a misdemeanor, and the killing must take place while the act is being resisted, or immediately following its failure and abandonment, and are not applicable to cases of mutual combat.

ERROR to the Circuit Court of *Jefferson* County.

Hon. URIAH MILLSAPS, Judge.

Plaintiff in error was indicted at the November term, 1874, of the circuit court of Franklin county, for the murder of one Judson Bailey. The venue was changed to Jefferson county, where the case was tried. All the material facts detailed by the witnesses are set out fully in the opinion of the court.

The court, among other instructions to the jury, gave for the state the following:

2. "If the jury believe from the evidence that the defendant shot and killed the deceased, with a pistol, a deadly weapon, then the use of such deadly weapon is *prima facie* evidence of malice, and an intention to murder, and, before the presumption is overcome, it must be shown by the evidence in the case, to the satisfaction of the jury, that at the time of such use he was in immediate, real, or apparent danger of his life, or some great bodily harm from the deceased, and such danger must have been urgent, present, and imminent at the very time of the shooting, and that no reasonable mode of warding it off or escaping from it, except to take life, existed."

6. "The law tolerates no justification and accepts no excuse for the destruction of human life on the plea of self-defense, except that the death of the adversary was necessary, or apparently so, to save the slayer's own life, or his person from great

bodily injury, and there shall be imminent danger of such injury being immediately perpetrated. The danger to life or great personal injury must be imminent, present at the time of the killing, real or apparent, and so urgent that there is no reasonable mode of escape except to take life.''

7. '' By apparent danger is meant such overt actual demonstration, by conduct and acts, of a design to take life or to do some great personal injury, as would make the killing apparently necessary to self-preservation ; hence, if the jury believe from the evidence that at the time of the shooting the deceased, Bailey, was at a distance of thirty feet from the defendant, and armed only with a knife, and not advancing on the defendant, but standing still, and this was the only indication of danger, then such danger is not what the law means by the term *apparent*.''

8. '' If a party enters a contest dangerously armed, and fights under an undue advantage, though mutual blows pass, and kills his adversary, it is not manslaughter, but murder.''

The court refused to give, for the accused, the following instructions :

8. '' The court instructs the jury that the right of self-defense is not derived from the law, but it is a natural right which belongs to every individual, and all the law attempts to do on the subject of the natural right of self-defense is, to prescribe rules of caution and prudence to be observed by persons before exercising the right of self-defense, by ascertaining whether the danger really or apparently exists, and whether such danger is really or apparently imminent.''

10. '' The court further instructs the jury that a party may anticipate the attack of his antagonist, and justifiably slay him, if, under all the circumstances of the case, such attack is necessary to protect himself. While it is necessary that this design shall apparently be imminent, yet it is not essential that it should be immediate and impending at the very moment when Long shot.''

12. '' The court further instructs that even if the jury

Apr. T. 1876.]    LONG vs. THE STATE.    27

Statement of the case.

should believe from the evidence that the accused unnecessarily killed the deceased, after an attempt on the part of Bailey to commit an unlawful act upon the accused had failed, then such killing is not murder, but manslaughter.''

The following errors are assigned, to wit:

1. The court erred in hearing and deciding the motion to quash the indictment in the absence of the prisoner.

2. The court erred in overruling the motion to quash the indictment.

3. In overruling the application for a continuance, July 20, 1875.

4. In overruling the application for continuance, July 29, 1875.

5. The court erred in forcing the prisoner to trial without the presence of the witness, T. J. Ford, who had been regularly subpœnaed to attend on that day, and without allowing him compulsory process to have said witness in attendance before the trial began.

6. The court erred in overruling the application of the prisoner to postpone the trial to a future day of the same term of the court, to afford an opportunity for the enforced attendance of material witnesses for defense.

7. The court erred in excluding from the jury the evidence of F. H. Dorsey, Robert Farr, Robert Rawles, W. P. Cassidy, and C. P. Herrington.

8. The court erred in overruling the motion of accused to exclude the evidence of S. F. Williams, a witness for the state.

9. The court erred in granting for the state the 2d, 6th, 7th, 8th, and 9th instructions to the jury.

10. The court erred in refusing to grant, at the request of the accused, the 8th, 10th, 11th, and 12th instructions to the jury.

11. The court erred in refusing to grant a new trial.

12. The court erred in overruling the motion of accused in arrest of judgment.

*Hiram Cassidy*, Sr., for plaintiff in error:

I.   The prisoner should have been present at the bar of the court when the motion to quash was heard and decided.   He was confined in jail.   Scaggs v. The State, 8 S. & M., 722; Const., art. 1, § 7; 13 Grattan, 763.

II.   The continuance should have been granted.   Ogle v. The State, 33 Miss., 383; McDaniel v. The State, 8 S. &. M., 401–443; Lundy v. The State, 44 Miss., 675; Yancy v. The State, Opinion Book "J," 496; Howell v. The State, 34 Miss., 48; Spence v. The State, 8 Blackf., 281; Vanblasicum v. Ward, 1 ib., 50.

III.   The trial should have been postponed to a future day of the term, and compulsory process issued for the witnesses. Const., art. 1, § 7; Code of 1871, § 2806; Yancy v. The State, Opinion Book "J," 496.

IV.   The testimony of S. F. Williams should have been excluded; he says accused did not mention the name of deceased; its exclusion was important after the exclusion of the testimony of Farr, Herrington, Dorsey, Rawles, and Cassidy.   It was error to exclude their testimony, and still greater error to refuse to exclude the testimony of S. F. Williams.

IV.   The 2d and 6th instructions were erroneous; they propound the rule that the use of a deadly weapon is evidence of malice, which can only be overcome by making out a case of self-defense under the law, and is evidently drawn from the language of the court in the case of Evans v. The State, 44 Miss.   The two cases are not parallel in any of their facts.   This case was a killing on a sudden quarrel.   See Cotton v. The State, 31 Miss., 504; Hayne's case, 34 Miss., 620; Head's case, 44 Miss., 753; 45 Vermont, 308; Trobe's case, MSS. opinion.   The facts in this case reduce it at least to manslaughter.   2 Bish. Cr. L., § 699; Cotton v. The State, 31 Miss., 504; Preston v. The State, 25 Miss., 383; Wray's case, 30 Miss., 673 (both opinions); Trobe's case, MSS. opinion.

VI.   The 7th instruction for the state is an instruction on the weight of the testimony, and is error.

"If the jury believe from the evidence that at the time of the shooting the deceased, Bailey, was at distance of thirty feet from defendant, and armed only with a knife, and not advancing on defendant, but standing still, and this was the only indication of danger, then such danger is not what the law means by the term apparent."

This withdraws from the jury the question of danger. See the case put in Evans v. The State, 44 Miss., 773.

VII.    It was error to grant the 8th instruction for the state. It is not the law, and is wholly inapplicable to the case at bar. Accused *did not provoke the fight*, but it was thrust upon him by a party against whom he had no cause of anger.    See Judge Handy's opinion in Wray's case, 30 Miss. ; Roscoe's Cr. Ev., 724 ; Price's case, 36 Miss., 531.    The 9th instruction is also erroneous.

VIII.    The court erred in refusing the 12th instruction asked by the accused ; it is a transcript of the Code, modified by names of the party, etc.    Code of 1871, § 2683.

IX.    The motion for a new trial should have been granted.

*G. E. Harris*, Attorney General, for the State.

I.    The absence of the prisoner, when the motion to quash was heard and decided, is not fatal.    It was not a step in the trial, but to avoid the trial altogether.    It would extend the doctrine too far.    It has not been carried to that extent. Scaggs v. The State, 8 S. & M., 722 ; Const., art. 2, § 7 ; 5 Abbott's Dig. (new ed.), 780 ; Sou v. The People, 12 Wend., 344 ; People v. Winchell, 7 Cow., 525 ; Stephens v. The People, 19 N. Y., 549.

II.    The granting of a continuance is a matter of discretion with the court.    Noe's case, 4 How., 330 ; McDonald's case, 8 S. & M., 401 ; Lundy's case, 44 Miss., 669 ; Code, 1871, § 633.    See Yancy v. The State, MSS. Opinion Book "J," p. 496.

III.    It was not error to exclude the testimony of Farr and other witnesses, as to the character of Manton Lee, because Lee had no connection with this case.

IV.   The testimony of Williams was properly submitted to the jury.   It showed that the accused was attempting to arm himself, and spoke of trouble he was in and expected more, the same day, and before the shooting.

V.   The instructions for the state were properly granted. Scott's case, 4 Iredell (N. C.); Rippey v. The State, 2 Head (Tenn.), 220; Dyson v. The State, 26 Miss., 388; Wesley v. The State, 37 Miss., 349; Evans v. The State, 44 Miss., 774, 775; 10 S. & M., 25; 36 Miss., 91.

Where a resistance is made by a deadly weapon (says Mr. Bishop), and the weapon is used in a very cruel manner, not justified at all by the nature and danger of the assault, the offense amounts to murder, if death ensues.

The rule of construction to be applied to the language used in every opinion of the court is, that it must be construed with reference to the facts in the case.   Apply this rule to the authorities cited by counsel, and it is respectfully submitted that they do not bear him out in the position assumed.

I have no objection to the rule laid down in Cotton's case, when the facts bring the case of the accused within the rule laid down in the extreme case put by Judge Fisher in Cotton's case.

Special attention is invited to the cases of Scott, 4 Iredell (N. C.); Rippey, 2 Head (Tenn.), 220; and Wesley's case, 37 Miss., 349, as conclusive on the instructions granted for the state.

VI.   It was not error to refuse the instructions asked by the accused.   They assume the facts, and take the question from the jury.   It says "whether it was or not apparent to Long."   It makes the accused the final judge of the danger. The jury are to be the final judges of the danger.   "When the accused undertakes to judge of the danger, and acts upon his own judgment as to the appearance of danger, he does so at his peril."   37 Miss., 349.   See, also, 10 S. & M., 25; 36 Miss., 91; Wharton's American Cr. Law, § 3080; and 39 Miss., 613.

CHALMERS, J., delivered the opinion of the court.

Plaintiff in error was convicted of the murder of Judson Bailey, and sentenced to the penitentiary for life. The attendant circumstances were these: On the first day of the November term, 1874, of the circuit court of Franklin county, plaintiff in error appeared before the grand jury and presented Manton Lee, the father-in-law of Bailey, to that body for indictment for having slandered a female relative of plaintiff in error. That he was going to take this action seems to have been known in advance. On the day before he had looked at a pistol with a view of purchasing it. He offered at the same time to sell his land for cash, stating that he was already in trouble, expected to be in more, and anticpated having to leave the state. On the other hand, the deceased, Bailey, stated to a deputy sheriff on the morning of the killing that he expected to have a difficulty with Long. When Long came out of the grand jury room, where he had just reported Manton Lee for slander, Bailey, the deceased, was standing near the door talking to this deputy sheriff. He immediately accosted Long and remarked that he desired to talk with him. He walked out of the court house, followed by Long; the two walked together to the jail, fifty or sixty yards distant, and disappeared from view behind the corner of that building. What passed between them there is not known. In a short time they re-appeared, talking earnestly, but in a low tone of voice, and retracing their steps slowly toward the court house. When they traversed about half the distance, their language suddenly grew louder and more angry. The first words heard were those of Bailey, who exclaimed in an excited and passionate voice, "If you have anything against Manton Lee take it out of me." As he said this he faced Long, with his right hand under his coat. Long answered, "Lay down your weapons and fight me like a man," at the same time pulling off his hat and throwing it on the ground. Bailey replied, "You are a God damned cowardly son of a bitch." Long answered, "You are a damned liar." Bailey drew a dirk-

knife and stepped towards Long, raising the knife in his right hand, and grasping Long's shoulder with his left. Long, with both hands, pushed Bailey back; he retreated himself a step or two backwards, then turned and ran ten yards, or thirty feet. As he ran he was pulling at a pistol from behind, which seemed to hang in his clothes; as soon as it was drawn he faced around. He raised and leveled his pistol with great deliberation, and then lowered it. In an instant he raised it again, took deliberate aim, and fired. The ball cut Bailey's right arm and penetrated his breast near the right nipple. Long was at once arrested and disarmed, exclaiming, as he was taken into custody, "He drew his dirk on me." Bailey lingered two days and died. This much of the circumstances is established on both sides. The only point of difference is as to the position and action of Bailey at the moment of the firing. Five or six witnesses for the state testify that he was standing perfectly still, with his arms hanging down by his side, with his dirk in his right hand. Nearly as many witnesses testify for the defendant that Bailey had his right arm across his breast, grasping, with his hand under, the lappel of his coat, and that just before, or as, Long fired, Bailey took a step in advance towards him.

The verdict of guilty would seem to imply that the jury adopted the view urged by the state. It must be remembered, however, that nearly every witness for the state confessed, on cross-examination, that his eye was fastened on Long, and not on Bailey, at the moment of the firing, and that the surgeon introduced by the state testified that the arm must have been resting across the breast when it received the shot, which passed through it into the right breast—the theory of the state being that the killing was done at a period when the deceased was making no advance, nor any hostile demonstrations; while that of the defense being that, at the moment of killing, the acts of the deceased afforded reasonable ground to apprehend impending danger. The attitude and demonstrations of the deceased became a vital point in the case. If the

case was fairly submitted to the jury, without prejudice from any erroneous action or rulings of the court, and under proper instructions as to the law, we should not be disposed to disturb their verdict, in so far as it was an ascertainment of the facts, even though we were inclined to a different opinion of the testimony. It is assigned for error that the court refused a continuance for the term, and refused, also, a postponement of the trial to a future day of the term, when asked, on account of the absence of material witnesses. As to all of these witnesses, save the witness Ford, it was admitted that their testimony was cumulative; and it was also true that the subpœnas had not been executed upon them, though this happened through no fault of the defendant. The witness Ford, who lived in an adjoining county, had been duly cited by the extra diligence of the defendant, who had hired and sent a special messenger to summon him. The affidavit for the continuance averred that proof (which was set out in detail) could be made by him which could be made by no other witness, and this proof was, we think, material to the issue. The court, having overruled the application for a continuance to the next term, was then asked to postpone the trial until a later day of the same term, and to issue an attachment for the witness returnable to such day. This, also, the court refused, and ordered the trial to proceed forthwith, at the same time issuing an attachment for the witness returnable instanter. The trial proceeded, but the witness did not arrive. The killing was done in an exceedingly public place, and in the presence of a large number of spectators. The testimony which it was averred would be given by the absent witness related solely to what occurred at the moment of killing, and the court seems to have acted on the idea that it was improbable that everything which occured could not be established by some one of the many witnesses in attendance. The result seems to have justified this expectation. A careful reading of the affidavit, which is exceedingly voluminous—covering eleven pages—and which is highly argumentative in its structure, fails to show any direct

statement of any fact which was expected to be proved by Ford
that was not actually proved during the trial by several other
witnesses.   It appears, therefore, that no absolute prejudice
was sustained by the accused.   The court, however, could not
have known in advance what proof would be made by the
other witnesses, and we must regard it as, at least, a very
dangerous exercise of its power to refuse both the continuance
and the postponement, where the facts alleged were material,
where all diligence had been shown, and where it was averred
that the proof could be made by no other witness.   Yancy v.
The State, MSS. opinion.

It is not shown by the record that the prisoner was present
when the notice to quash the indictment was heard and deter-
mined, and this is assigned for error.   It is well settled that
the record must show the presence of the prisoner, when in
custody, during the entire trial before the jury.   Scaggs'
case, 8 S. & M., 726 ; Price's case, 36 Miss., 542.

Whether the same requirement exists as to the hearing and
determination of questions of law is not so definitely settled.
A partial collection of the authorities on this subject will be
found in the concluding portion of the opinion of this court
in Stubbs v. The State, 49 Miss., 724, and also in the opinion
this day delivered in the case of Jo. Ralls v. The State.   We
think that the safer rule is, in cases of felony, to require the
record to show affirmatively the presence of the prisoner in,
at least, every step in the progress of the cause so important
as a motion to quash the indictment.

On the trial it was proved by Williams, a witness for the
state, that the accused applied to him for a pistol on the morning
of the killing, stated that he was in trouble and expected to be
in more, and would like to sell his land for cash, as he expected
to have to leave the state.

This testimony was intended to establish antecedent malice
and preparation.   To rebut this the defence proved by several
grand jurors that shortly after this conversation with Wil-
liams the accused appeared before them and presented Man-

ton Lee, father-in-law of deceased, for slander, and that said Lee was a quarrelsome man, frequently in difficulties, though not usually regarded as dangerous.

This testimony was, upon motion of the district attorney, ruled out. Thereupon the defense moved to exclude also the testimony of Williams, which motion was denied. This was erroneous. If the accused anticipated an attack it was clearly his right to prepare for it, and his action and language was as fairly susceptible of the interpretation that he was getting ready to resist an anticipated attack, as that he was preparing to make one. . The jury should have been left to judge, with all the testimony before them, which was a correct interpretation.

It is assigned for error that the court erred in granting the the 2d, 6th, 7th, 8th, and 9th charges for the state. The 2d and 6th instructions relate to the imminency and immediate character of the real or apparent danger which is necessary in order to justify the killing of a human being, and one in accordance with the frequent decisions of this court on that subject. Both of said instructions, however, announced that, in order to justify the killing, there must have existed no other mode of warding off or escaping the threatened danger. This is erroneous, nor is the error corrected by any of the other charges given in the case. Flight is a mode of escaping danger to which a party is not bound to resort, so long as he is in a place where he has a right to be, and is neither engaged in an unlawful enterprise, nor the provoker of, nor the aggressor in, the combat. In such case he may stand his ground and resist force by force, taking care that his resistance be not disproportioned to the attack.

The 7th instruction given for the state sums up hypothetically the theory of the case as presented by the state, and instructs the jury that, if they believe that such were the facts, such facts do not constitute " apparent danger."

It is insisted that this was an instruction upon the weight of the testimony, and an infringement upon the province of

the jury, inasmuch as what constitutes apparent danger must ever be a question for the jury and not for the court.

We have been considerably impressed with this view, and have given it due consideration, but we cannot wholly concur in it. The jury are the judges of the facts, and the court of the law. "Apparent danger" is a legal phrase, as much as "ordinary care" or "necessary diligence" in civil cases, and the facts that constitute the one must, in theory at least, be as well settled as those that make up the other. The theory of the law is that, whenever a given state of facts are definitely ascertained and determined, the law at once arises thereon, and that its conclusions are unerring. A knowledge of what those conclusions are resides in the breast of the court, and must be declared when demanded for the guidance of the jury. Whenever, as by a special verdict, the facts are settled by the jury, the law will be announced by the court; or, where the judge is called upon in advance of the verdict to lay down the law for the instruction of the jury, he may, and should, hypothetically state every phase of the testimony, and inform them as to the conclusions of law arising upon each statement.

That this is the true rule, where the judge is allowed to instruct orally and as to the general principles of law, there can be no doubt. The principle is not varied by our statute forbidding charges except upon the written request of the parties, provided the counsel present in writing such hypothetical statements and conclusions, with the request that they be given to the jury. Nor can we perceive how the doctrine of "apparent danger" forms any exception to the general rule.

Whether a particular state of facts constitutes what the law denominates apparent danger, which primarily is a mixed question of law and of fact, must ever be a question of law when the facts are definitely settled. A party slaying another, under apparent danger to himself, must of course judge for himself in the first instance, but at his own peril if his judgment be not concurred in by the court and jury who sit afterwards upon his act. In their investigation of his act, each of these tri-

bunals performs its own appropriate functions—the one to ascertain the facts and the other to determine the law arising thereon. In so doing they must not try him by the light of subsequent developments, nor require of him the same cool judgment that they can bring to bear upon the occurrences. They must put themselves, as far as possible, in his place, and judge whether the danger was apparent, or should have been deemed apparent by a man so circumstanced.

They will not allow him the benefit of his own timidity or needlessly exaggerated fears, as has been said in some of the cases, but they will determine what an ordinary and reasonable man might fairly have inferred from all the facts and conditions by which he was surrounded.

It must still remain true, however, that when these facts have been properly ascertained the law will fix upon them its own conclusion, and that this conclusion may be announced by the judge, in advance, upon a hypothetical statement of the facts. The principle finds an appropriate illustration in the instruction under consideration. It announces in brief that if the jury believe from the testimony that the deceased was standing perfectly still at the moment of killing, at a distance of thirty feet, armed only with a knife, and making no movement in advance, nor any other hostile demonstration, that this did not amount to " apparent danger," within the meaning of the law. That this proposition was true there can be no doubt, and we can find no principle that forbade its being given. We must say, however, that what will, and what will not, constitute apparent danger is a matter so exceedingly difficult to define, depending upon things so varied, so minute, and often so unnoticed by the spectators, that this kind of instruction is to be deprecated, and in cases of doubt should not be given at all. We should not hesitate to reverse where the court had undertaken to instruct as to whether a hypothetical statement of facts constituted apparent danger, if such statement included any fact from which any reasonable man might have inferred its existence. In such case the court should content

itself with general definitions of apparent danger, leaving the jury to apply them to the facts of the case.

The 8th instruction given for the state was erroneous in omitting the qualification that the weapon used had been procured for the combat, or that the accused provoked the difficulty, or entered into it with any intention of using the weapon. The facts show that the deceased brought on the combat in which he lost his life. The question at issue is whether he was slain after he had entirely abandoned it, and at a time when his adversary was in neither real nor apparent danger. If he was so killed, the offense will be murder or manslaughter, accordingly as the jury may believe that it was done through malice and revenge on the part of defendant; was committed before the passion excited by the violent assault upon himself had cooled. If committed under apprehension reasonably entertained by the defendant that his own life was still in imminent danger, it is justifiable homicide. No objection is perceived to the charge for the state.

The 8th charge asked for the defense, which was refused, announced the truism that the right of self-defense was not derived from the civil law, but existed by virtue of the law of nature. It might have been given or refused, so far as we can see, without in any manner affecting the case.

The 10th instruction asked by the defense was refused. It announces the doctrine that a man need not always await the attack of his adversary, but may anticipate his attack and slay where it is necessary to save his own life. This is true in extreme cases, and necessarily results from the doctrine that a man may do anything essential to his own protection. It is not believed to have been called for by the circumstances of the case at bar. It was not necessary to invoke this principle if, as contended by the defendant, the deceased was advancing on him at the moment of the killing, in a threatening attitude. It is not applicable if, under the theory of the state, the deceased was standing still, at a distance of thirty feet, with no weapon save a knife, and this resting

quietly at his side.   There was, therefore, no error in refusing the charge.

It was erroneous to refuse the 11th charge asked by the defendant.   It correctly announced the law, and should have been given, though it would have been more perfect if it had contained the qualification that, in arriving at their conclusions, the jury should be guided by the instructions of the court as to the law.

The 12th instruction asked by the defense, and refused, was based on § 2638 of Rev. Code, and is almost an exact transcript of it.   That section declares that " Every person who unnecessarily kills another, either while resisting an attempt by such other person to commit any felony, or to do any other unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

Though this provision has been on our statute books for many years (Code, 1857, p. 602) it has never undergone adjudication, so far as we can discover.   It is borrowed from the Code of New York, where it is to be found in the same words.   2 Rev. St. of N. Y., p. 661, § 11.   It seems to have come under review in that state in one case only, and · that one throws no particular light upon it.   Raloff's case, 2 Abbott's Practice Reports (N. S.), 245 ;  s. c., 45 N. Y., 213.

We confess ourselves much embarrassed to give it a proper construction.   The language, literally taken, seems to mean that every killing will be manslaughter, however unnecessarily perpetrated, provided it was done while the party slain was engaged in an unlawful act, or after the attempt to do such unlawful act had failed and was abandoned.   Thus construed, there is no limitation as to the time when the killing must take place, nor any limitation upon the nature of the unlawful act which the party slain had been engaged in attempting.

In this broad sense it would declare as manslaughter the killing of a man who had been engaged the hour or the day before in an attempted trespass, which had failed.   Such a construc-

tion would be *aliter* inconsistent with the cardinal principles of criminal law, and shocking to the moral sense.

We must think that the " unlawful act" spoken of means a crime or misdemeanor. The language is " to commit a felony, or to do some other unlawful act." The unlawful act, we think, must be of a criminal nature, even though inferior to felony. We think, further, that the killing must take place either during the actual resistance to the unlawful act, or immediately following its defeat and abandonment. If it occurred after the lapse of any considerable period, it would seem impossible to divest it of the element of malice. Thus construed, the statute amounts to this: If I see another engaged in the commission of an offense against the criminal laws and I resist its accomplishment, and in such resistance slay the person so engaged, my crime will be manslaughter and not murder, even though the act of killing was unnecessary to the defeat of his act; and the same result will follow where the killing ensues instantly after the abandonment by him of his attempt. Because I was engaged, or had just been engaged, in resisting the doing, by him, of an unlawful act, the law will, to some extent, throw the mantle of charity over the necessary slaughter committed by me, by reducing my offense from murder to manslaughter. It amounts to a legal imputation of heat of blood for my benefit, whether in point of fact the jury should believe that there was such heat or not.

The party slaying, however, cannot take shelter under it if the jury should be of opinion that there was actual malice. The killing must have occurred *bona fide* in the resistance to the unlawful act, or immediately after its defeat, and must have grown out of the commission, or the attempt to commit the act, and not out of any previous ill-will, nor any personal grudge then and there engendered.

We confess to some diffidence in the announcement of this construction of a statute which seems to need legislative revision. We have given to it that interpretation which seems most in harmony with its own language, without violating those

·cardinal principles of criminal law which we cannot think that it was the intention of the legislature to overturn.

We do not think that it was intended to apply to cases of mutual combat, unconnected with the commission or attempt to commit some other unlawful act by the party slain.   Such cases are governed by other clauses of the statute, or by the well-settled principles of the common law.

There was, therefore, no error in the refusal to grant the 12th instruction asked by defendant below.

For the other errors indicated herein the cause is reversed, the verdict set aside, and *venire de novo* awarded.